v. Deary & Cynthia Schmidt, Pekin Insurance Company Debbie Bruce v. Schmidt Eric Carlson v. Pekin Insurance Company Scott Huff v. Deary & Schmidt Good morning, Your Honor. May it please the Court, if I may reserve the five minutes for rebuttal. Thank you, Justice. Counsel, we have today with us Ms. Conway, who helped us write the briefs, as well as Attorney Morrissey, who, this was long before he was Mayor Morrissey, and this case has been pending for over ten years now. Counsel, Mr. Conway, Mr. Carlson. The issue before the Court here today is whether or not the defendants owed a duty to preserve the fire scene evidence so that Mrs. Combs could determine the cause of the fire that killed her husband and two minor children. That's the issue before the Court. I know the Court's very familiar with the facts of the case. But very briefly, the Combs family rented this home from Deary & Cynthia Schmidt. The home was always insured by the Pekin Insurance Company. For years, there had been electrical problems in the home, which not only Mr. and Mrs. Combs each had complained to the landowners about, but so did prior tenants complain about various electrical problems. Counsel, I have a question. Certainly. Since Pekin was not a party to any one of the three agreements that were discussed here, either the lease, the consent agreement, or the insurance policy, how do you find that there's a duty vis-a-vis Pekin with regard to preservation of the evidence? Sure. Dix v. Mutual Insurance Company. Justice, the Illinois Supreme Court has ruled in the Dix case that in a circumstance in which you have a tenant of a property who is renting the property, he or she is making rental payments. And the Supreme Court has held those rental payments, in part, go to pay the premiums on the fire insurance. That was a subrogation case in which equitable principles apply. This is not a subrogation case where equitable principles apply, correct? It was a case, Justice, in which that was a subrogation case. You're correct. But I would suggest to you that there may have been issues also about subrogation in this case. We don't know, for example, if there were rental furniture that Mrs. Combs had in the home. There could have been a number of different subrogation claims. I mean, in looking at subrogation in the broadest context, that's really what we're talking about in the sense that there may have been other third parties responsible for the injuries that she suffered. Mrs. Combs, both on a wrongful death, personal injury level, as well as from a personal injury. But doesn't he talk about equitable principles? Absolutely, Justice. Do equitable principles apply to this circumstance? I believe that they do in the context that I just described, that there may have been very well subrogation claims arising out of this occurrence. But I agree with you it was a subrogation case. You began to allude to the fact that the tenant had requested a landlord to make repairs for the tenant's benefit. Do you have any case statute, any specific legal authority that says that the landlord agrees to make repairs for the tenant's benefit? If he fails to do so, that gives rise to cause of action for failure to preserve evidence in a spoliation case, not negligence in a spoliation case. Absolutely. That's the Brobey v. Enterprise case in which the – that's the unanimous case from the First District relying upon the voluntary – the special circumstances, I'm sorry, theory. And in Brobey, unanimous case, the First District, there are really four factors the court looked at. Number one is the point that you raised, Justice Hudson, which is in that case the plaintiffs had rendered the ban from Enterprise Rent-a-Car. They noticed that the steering wheel was wobbling when they applied the brakes. They complained to Enterprise before the tragedy in which all of those people were injured. And Enterprise said, go ahead and you'll drive the car. After the occurrence, they also complained to Enterprise about that fact. So, yes, that – and that is a spoliation case in which the First District upheld that a duty was owed to preserve the evidence. However, isn't there some affirmative conduct in that case that you can look to? Didn't Enterprise segregate the van for the benefit of the plaintiffs? Here, Pekin didn't have anything to do with the tenants, did they? Well – I mean, there was affirmative conduct. Enterprise looked at the van, inspected it. They segregated it for the benefit of the plaintiffs. Do we have that here? Absolutely. Pekin, absolutely, undisputed. See, that's the problem. They can't get around the fact, either under voluntary undertaking or special circumstances, in both the voluntary undertaking, contact, and special circumstances, the courts are looking at and broguing. The court relied upon – you're right, Justice, and I embrace that fact. The court took in as the second factor that they looked at that Enterprise inspected the van. You're absolutely right. And there's no question in this case Pekin inspected this property. There's no question they preserved the property. How is it that this property existed from December 20th of 1999 until January 5th of 2000? It was preserved so that Pekin could inspect that property. It was continuing to be preserved until the time that it was ultimately destroyed two months later on February 16th, 2000. It's in terms of a subtle fact, but arguably in Enterprise, in the case you cited, in Brophy, Enterprise segregated, I believe it's in the case itself, for the benefit of the plaintiffs, for the plaintiffs' benefit. So you can see why that would be an affirmative conduct. Did Pekin ostensibly do something for the benefit of the plaintiffs, for the tenants in this case? Well, absolutely. Well, first of all, under Dix, and we talked about that, that's number one. Number two, what Jones stands for, Jones v. O'Brien, and as well as Martin v. Keeley, both those cases clearly and unabashedly, and I quote from the cases, under the circumstances, we find that by preserving the I-beam for its own purposes, for its own purposes, Keeley voluntarily undertook a duty to exercise due care to preserve the benefit for all other potential litigants, including the appellants. That's exactly the same ruling that was Jones v. O'Brien. Once Country Mutual, and I'm quoting from Jones v. O'Brien, undertook to preserve the evidence for its own benefit, this voluntary undertaking imposed a duty to continue to exercise due care to preserve the evidence for the benefit of any other potential litigants. That's what they can't get around in this case. They know they inspected this property, and the possession and control in this case is overwhelming. The special circumstances How did those cases talk about the relationship problem? I mean, those Fifth District cases that this Court and Anderson criticized for glossing over, or perhaps even completely eliminating the relationship problem, went right to the foreseeability problem and said, if you keep this, you are doing a preservative for everybody that may be a potential litigant. And they really didn't talk about the relationship problem. The language you just quoted from that was really a foreseeability issue, was it not? Well, I mean, I guess in one context, the question arises, can a court consider foreseeability in deciding the first issue of the two-pronged analysis? And I would suggest that you can. And that's why I cited Marshall v. Bergkamp, the traditional four-pronged analysis that the Illinois Supreme Court has forever and continues to this day enunciate in terms of establishing a duty, but said first promise, foreseeability. So the Supreme Court tells us that that's what we look at. But I embrace Anderson. I actually like Anderson. They cited it, and I actually like it. Now, I would say that Justice Kapala's concurring thoughts with respect to Anderson is very good, and I would suggest that he thought that there was far too much analysis as to the first prong in the relationship analysis, and he goes right to the heart and talks about Shemovsky, which really is what we're talking about when we talk about public policy. I mean, is the public policy in this state that we're going to go in as a sophisticated insurance company and we're going to inspect this and try and figure out whether our insurers are liable or not liable, and then say, oh, no, no, nobody's liable here, and then bulldoze the house without ever telling anybody when they have, and I quote, they distributed. I mean, there's some salient facts here that really go to the special circumstances, and I would also suggest the voluntary undertaking. And if you just bear with me, an insurer has a duty to preserve fire scene evidence. The failure to do so is foliation. That is the title of the article that Pekin Insurance Company distributed to all staff and all managers years before this tragedy occurred. They further said, Pekin's own memos, this is not Devin Bruce asserting this is what they should do. Pekin said to its staff, do not destroy evidence until all parties have been completely notified that it's going to be destroyed. But how do you get from that policy or internal memos to establishing a relationship? Well, I would say those are all special circumstances, and my briefs are replete with those. I mean, they want to talk about a request being made. They want to talk about requests, right? First of all, no Illinois court has required as a matter of law that a request has to be made. There are some cases that talk about it in the abstract. No case has said you have to, even in Anderson, if you recall, I mean, Anderson is also good for me, just to go back to that before we're talking about second district cases. In that case, the plaintiff who was complaining that the evidence was foliated, they had an opportunity to inspect the evidence, one, and two, they were in fact told specifically the evidence is going to be destroyed. And still, this court in the second district said you can go back and replete your foliation claim. It's not done as a matter of law. But what I'm suggesting to you, Justice, with respect to this issue about how does that get me where I need to be, they're talking about requests. Request goes to notice. It goes to knowledge. Should we be preserving this evidence? And I suggest to you when they're in internal memos, suggest exactly what. See, the irony of it is, is what we're complaining to this court, that the fire scene's evidence, that the insurance company has a duty to preserve the fire scene, and that the failure to preserve the fire scene before you give everyone notification is foliation. That basic proposition, which is at the heart of this case that we're all deciding here today, is what they told their people beforehand, what their own experts told me in numerous depositions. They said they were in control of the property. Now, you're going to get up and hear a lot of comments from counsel for Pekin about their two issues, because they can't keep in mind the standard of view is de novo, but if there are disputed questions of fact with respect to the issues and the factors that give rise to duty, that's a question for the trier of fact. So they can't have this court have any acceptance that they have possession or control, because once this court decides that there's possession or control at all, or there's a question of fact about that, then we get to Martin, and we get to Jones, and I suggest you also get to Broby under a special circumstance, because Broby also said possession and control. So as soon as you start saying, well, Devin's got some facts on possession and control, then it becomes a question of fact for a jury. And they're overwhelming facts from their own employees with respect to possession or control. They insured the house. They paid for the destruction of the house. But the policy was silent with regard to preservation of evidence, correct? The policy was silent as to preservation of evidence. Right. So where is the language in the policy, or where is there language that the plaintiffs were even a third-party beneficiary? Well, let me answer the first question first. Okay. You said, where is it, Devin? All right. With respect to the Schmitts and Pekin, Cynthia Schmitt specifically testified. Pekin came in and took over control of the scene. Gary Schmitt, and I think this is an important point, because what they said in Jones, see, one of the defenses they want to say is Pekin didn't control the scene. They didn't own the scene. It was their insurer. They're trying to have this separation. But they got permission from the insurer to go in. Not only did they get permission, Justice, that is correct, not only did they get permission, but Gary Schmitt, and this is unrefuted testimony, they have nothing to refute this, that if Pekin told him not to demolish the home, he would follow Pekin's advice. He was taking direction from Pekin. And Cynthia Schmitt said they came and took over. But to get to the point that you asked where does this come up in all of the policy language, there was this express written consent that was specifically signed for this tragedy. Pekin said, you know, you sign this so we can go in, fully investigate at any time for as many times as they want to go in and preserve the evidence. I'm going to ask you a question, Justice. Tom Messer, when I asked him, he's their Pekin property manager that was involved in all this, and I asked him about that consent agreement in his deposition, and he told me Pekin had the right and the authority pursuant to that consent agreement to preserve any evidence they wanted from this fire scene. So that answers your question. It comes from the insurance policy. Then they went out and got a specific document. I mean, let's be clear about this. They said in their depositions they couldn't deny this. They're investigating this regarding the huge personal tragedy that occurred here. No one had ever seen at Pekin Insurance Company a case where three people had burned alive. No one. This was a one-of-a-kind. That's their expression. This was unique. We have to turn over every sermon to find out what happened. And they come in and they say, and I would say, we all acknowledge self-servingly, they say, well, there's nothing here. We're just going to bulldoze. Is control enough? Because if we're talking about a spoliation case, we're talking about control. I mean, you can't destroy something or lose something unless you control it at some point in time. So it's almost like a condition precedent to the case as opposed to an element, one of the factors to consider on relationship. Now, I want to get back to the relationship. Okay. If I'm controlling something, does that necessarily mean that I have a duty to anyone in the world that may want this for some civil loss? Because that's what the relationship goes to. There's got to be some nexus there between me controlling it and owing a duty to some other person. What's the relationship between me and that other person? Well, the relationship is, and what the courts have told us, that when you've gone ahead and done an inspection of that evidence, right, number one, that imposes a duty. Number two, when you've got a national standard, NFPA 921-9-3, which specifically says a nationally applicable standard, which they acknowledge, that says all fire scene evidence is key evidence and should be protected. Okay. Now, with that point, you're asking us to maybe go back on some cases that are Rogers v. Clark equipment and some cases that talk about the internal procedures and industry practice does not set the duty. It may set the breach. It may set the standard of care. It doesn't set the duty. Okay. And, again, we've got to get to relationship here. Again, because we're talking about the industry standards. You've got to preserve this. But for whom and for how long? And what's the relationship between who wants it and me possessing it? Well, for Mrs. Combs, whose family burned alive in the house. I mean, for whom? Is it for everybody in the world? And you bring up a good point. In the fire scene context and in this broad context, it talks about, well, the case law talks about potential litigants. And, more specifically, in the fire scene context, they talk about interested party, who's an interested party. And certainly, and I ask this question ad nauseum for Pekin, they don't contest the fact, and I think no one would contest the fact, that Mrs. Combs was an interested party where her family burned alive. I mean, we all agree that. So I'm trying to answer your question. So with respect to who, Devin, do I have to control this for the whole world? No. But for Mrs. Combs, did they have to preserve it here? Yes. And I'm only asking. Let's be clear. I'm not asking. Let's go back to these martial factors and what I'm asking, what the burden is. I'm only asking that Pekin should have done what they, and I know you're very, you know, what they said in their own form letters prior to this occurrence for years, to notify the tenant that they had the right and the authority to go and get their own fire investigator, to tell them they could perform their own fire investigation, and to tell them when the evidence is going to be destroyed. And frankly, that same form letter, over and over, there's elements of control. And to answer, you made a comment, yeah, don't we have to find control? Yeah. We're talking a lot about control today, and I think I've got overwhelming facts on control. Even after they bulldozed this thing and Mr. Morrissey contacted them and said, well, we want to come to the scene, what did they say in their case notes before lawyers and lawsuits and before arguing about all the spoliation? What did they say? We may allow them, him, to go in. Now, if that's not control in Pekin's mind, I don't know what is. Counsel, you alluded to the form letter that Pekin has. Excellent. Is that an industry practice to send out this form letter? It is industry practice to follow those guides and criteria, and there's a lot of opinion testimony that's been taken to this case, and the answer to your question is yes. Whether they call them on the phone, my experts all said that you're supposed to send them the letter, but the answer is yes. That's true. Are you arguing that an industry practice can create a duty? No. I'm saying in this context, with spoliation, together with the other factors it can create, it's a special circumstance. I mean, I don't know how you can. The 800-pound gorilla in the room here is they said in advance that this is spoliation if you don't preserve the fire scene, and they don't want to talk about that. They want to talk about they didn't have possession control, and I'll embrace that. And they also want to talk, and before my time is up, they also want to talk about this demolition order, and I do want to take two seconds to address that. Okay, this demolition order, first of all, that doesn't get them anywhere, if you assume for discussion's sake that there is a duty, right? So that doesn't get them anywhere between the date of this tragic fire on December 20th of 1999 until the time that the fire scene is destroyed on February 16th, 2000. For that two months, the demolition order wasn't enforced. The house was still up and standing. So what I'm saying to you is that gets them nowhere. They still could have notified Mrs. Combs, irrespective of the existence of the order. So, I mean, logically it makes no sense. Legally, they've cited to you no case law authority that says Boyd is automatically overturned and the Supreme Court law on preservation of evidence is overturned if there's an administrative order. But then, over my objection, Pekin's counsel decided they would take the depositions of all these city of Rockford employees in the housing department to find out all about this demolition order. So I went to the depositions, and what did we find out? These are continuously, routinely extended, the demolition orders, one. Two, I asked them then when I heard this, would you have extended this order of Pekin or the Schmitz order? Absolutely, we would have extended it. This house can remain standing, and we have affirmative evidence in the record that these fire homes, fire-damaged homes, have remained standing for years. It's a red herring. The only defense that they have is possession of control, and you have to decide if you're going to follow either voluntary undertaking or special circumstances under Broby. We are on all fours on either of those cases, either of those branch, either theory, and we all agree, they agree, that I only have to have a proper basis to impose a duty to preserve evidence on one. I think we've got voluntary undertaking, special circumstances, and agreement and contract. All you have to do is find on one. But if there's a question about possession of control, if you have a question in your mind, well, you know, Mr. Howey's got some points about possession of control, and I don't know if they did or they didn't, but Mr. Bruschke, then it's a question for the jury to determine whether they have possession of control. That's the standard review under Mark v. Keeley in the related case law. With respect to the special circumstances under Broby, I think I was talking about what the factors are that go into that. Broby looked at the fact that the plaintiffs in that case complained about the wobbly steering wheel that breaks beforehand and after. We have that here, and they're going to get up and say, well, Mrs. Combs never complained about the flickering lights and the electrical problems. They never made that complaint to Pekin. Well, I would say that that's an overstatement, because when I took the Pekin's insurance adjuster's depositions, they admitted to me they were dealing with the Rockford Fire Department. The Rockford Fire Department had spoken to Mrs. Combs, and she told them before lawyers and lawsuits that fuses were blowing frequently and that there were a lot of electrical problems in the home. She told that to them. That was in their Fire Department report, and I asked them, did you know, in fact, that there were a lot of electrical problems in the house that the tenant complained about before you destroyed the home? And the answer was yes. So she complained. They complained before. Did Broby talk about these prior complaints in the context of the first Miller factor being like an equivalent or the equivalent of a request? I don't remember. I don't remember that in what context. I mean, they relied on that. They relied upon the fact that Enterprise did inspect the van, which we have here, and they relied upon the fact that Enterprise had possession and control of it, which we have here as well. So, I mean, you know, what else do we need? I mean, and it's ironic. Do you think the second Miller factor was in favor of your client being the request? There was no request by your client. The house stood for two months, and there was no notice, according to the pleadings too, but no notice from Pekin or the Schmitz to your client that it was going to be demolished. But during this two-month time, there was no request, correct? Well, I was going to answer it differently until you added that caveat. There was a request at the end, Justice, but it was after the time that they had already decided that they weren't negligent and their insurer wasn't negligent and they bulldozed the home without giving. There was a request made, and I think that you raise an important point. If you look, I think it is the Broby decision. I think it's the Broby decision where a letter was sent, and then the court said, well, giving these people just a short period of time, I think it was a week or so since the letter arrived and the time it was destroyed, I think it was Broby, that that is insufficient here. They never gave him any notice at all. And, of course, this court did not rule out, as a matter of law, forever barring the Anderson claim. And remember that the plaintiff in that case did receive a letter saying that the property was going to be destroyed, and this court said you can still go back and replete your spoliation cause of action. So I think that's an important point. I think my time is up. Thank you. That's correct. Mr. Howie? Good morning, Your Honors. I am Scott Howie. I represent the defendant, Appa Lee, Pekin Insurance Company. And with me here is Eric Carlson, who represents the defendant, Appa Lee's, the Schmitz. We've agreed that since the issues are essentially the same as to all the defendants, I will take the bulk of the time. Mr. Schmitz has asked that I leave him a minute or two at the end, if necessary, to address something for his own clients. Your Honors, it was proper for the circuit court to enter summary judgment in favor of the defendants in this case because the plaintiffs failed to establish any duty owed by any defendant to her to preserve this evidence. There are standards that govern the duty to preserve evidence in Illinois. They are set forth originally in the Supreme Court case of Boyd, and they've been developed in several decisions since then, most notably the Dardeen case, also from the Supreme Court, which favorably cited and relied upon this Court's decision in Anderson. There are clear standards by which that duty is established. They are set forth in Boyd as being a contract, agreement, or statute, voluntary undertaking, or special circumstances. As to whether there is a contract or agreement in this case, I think the plaintiff has done a fairly good job of establishing why there is no such agreement. And this Court has recognized just this morning that there is no agreement to which all the parties in this case are party. There is no agreement under which any of the defendants agreed to preserve evidence for the benefit of the plaintiff. The argument has been made in the plaintiff's brief, the reply brief for the first time, that it doesn't matter what the provisions are, that as long as there is some kind of contractual relationship, that there is a duty arising from that relationship. And they even have the audacity to cite Boyd for that proposition. But that proposition is squarely contrary to Boyd. Counsel, obviously you're familiar with the Dix case. Certainly. It's a segregation case. The Court essentially held that because the tenant's paying the premiums, the law should fall on the insurance company. Why wouldn't the logic and rationale in Dix apply here where the tenant's paying the premiums? Well, that logic and rationale has never been applied outside the segregation context. Correct. But why shouldn't it be applied? Because it's specific to the segregation context. And the reason that Dix reached that conclusion, the Supreme Court found that the tenant was a co-insurer for purposes of subrogation, was because it determined it didn't make sense to have a subrogation claim against someone who was essentially in the same position as the insured. More important for this case, first of all, the Dix argument the plaintiff makes is only relevant to the Pekin insurance policy, under which he claims that Pekin owed his client the same duties that it owed to its named insured, the Schmitz. More important than the co-insured argument, we can assume for the sake of argument this morning that the plaintiff was a co-insured, even though she wasn't technically a named tenant. If she was a co-insured, and if she was owed the same duties that Pekin owed its named insureds, then you still have to look to the policy to see what the provisions of that policy are. And there is no provision, as Justice Zinoff recognized this morning, no provision in the Pekin policy that requires Pekin to preserve evidence for anyone's benefit, whether it's its own named insured or some putative co-insured, like the plaintiff in this case. But if we find that they're co-insured, that the plaintiff's a co-insured, then you've satisfied the relationship law. Now we move to the foreseeability law. And then the issue is not policy language. The issue is whether it was foreseeable for Pekin to realize that the plaintiff may need this evidence later. With respect to Your Honor, I would take issue with that. I think if you establish that she is a co-insured, you still have to look to whether there is a relationship established within the policy. Let's say for the sake of argument, just for this morning's sake, that she is an insured on the policy, and entitled to all the same rights and benefits that the Schmitz, as the named insureds, were entitled to under the Pekin policy. If she's entitled to those same benefits, those benefits have to include a duty to preserve evidence. That's what the contractual agreement element of Boyle speaks to. It says if there is an agreement by which the parties have agreed to preserve evidence, well, that's a sufficient relationship. And then you can move on to foreseeability. That's not the case here. Because even if we accept Mrs. Combs as a co-insured on the Pekin policy, the Pekin policy doesn't provide a duty to preserve evidence for anyone's benefit. What it states is, in fact, the only thing it states as to investigation is not a duty, it's a right. Pekin has the right. It says it may investigate any occurrence at its discretion. And that is hardly the sort of duty to preserve evidence or even to investigate the scene on which the plaintiff's argument relies. I'm trying to parse the language of the policy, but there may be some language in the policy of a more general nature, such as Pekin will act in the best interest of the insurer or something like that. Let's just leave that for a second. Do you agree or disagree with counsel's comment that your only viable defense is to refute possession and control? If we were to find that Pekin had possession and control of this scene for two months before it was bulldozed, and then certainly was involved in the bulldozing, do they win? Not at all, because even the exercise of possession and control is necessary to a finding of a duty, to the necessary relationship or a special circumstance, but it's not sufficient. In other words, it's necessary to have it, but just having it isn't enough to establish the duty. Possession and control alone doesn't do it. In addition to possession, there also has to be some sort of actual voluntary undertaking. And as one of the justices this morning, I lost track in all the furor. All the posing questions. All the wonderful questions this morning. One of you observed that simply having control doesn't necessarily mean you're assuming the duty, and that's consistent with the case law. The case law suggests, and it points to, most specifically all the courts have pointed to the Miller case from the Supreme Court. That's one of the X-ray cases in which the defendant very clearly had possession and control of the X-rays. There's another case, the Jackson case, I believe, from the First District, another X-ray case, where the defendant also had possession and control of the X-rays in question, and then somehow they were lost. Possession and control alone didn't do it, though. What was required was a request made of the defendant to preserve that evidence, and not just the request but the actual preservation of the evidence. So it's your opinion under the case law, in the absence of a request to preserve the evidence by the plaintiffs, there is no duty? That's correct. Absent other circumstances. There may be other circumstances. That's not necessarily an essential part of every case. It is certainly a relevant part in this case where there was no request. This Court held in Anderson, though, that even having a request, making the request to preserve evidence, is not enough to create the duty. Now, Post and Counsel has relied heavily on Brobey. Why isn't Brobey controlling this? Brobey held there was a duty. What Counsel relies upon in Brobey is actually not all the facts of Brobey, but merely the fact that complaints were made to the owner of the rental van in that case. That was the case where the rental van had experienced some problems, the plaintiffs had complained about it to the company that owned the van, and then there was an accident. And the plaintiffs in this case have complained that Pekin was aware of it. That's correct. So how do we distinguish this from Brobey? First of all, there's no evidence that Pekin was aware of the complaints before the fire happened. More importantly, though, Brobey included a lot more than just the complaints, and there's nothing in Brobey to suggest that that alone would have been enough to create a duty. What there was in Brobey was not just the complaints about the steering. The defendant, and I'm quoting the Court, the defendant undertook to preserve the car. There's no evidence in this case that Pekin or the Schmitz undertook to preserve the home. There was evidence that the defendant in Brobey segregated the van for the benefit of plaintiffs. That's another passage that's been quoted this morning already from Brobey. There's no evidence in this case that any of the defendants segregated the home or set it aside or preserved it in any way for the benefit of the plaintiffs. There was evidence in Brobey that the plaintiffs, in fact, did request to inspect the van. And, again, no request in this case until long after the fact, about two months, I believe, after the home had been destroyed. Was there any request made, maybe any suggestion made, that the plaintiffs might wish to preserve, might wish to inspect this evidence themselves? So those are all aspects of Brobey that went into the First District's conclusion that there was a duty, there was a necessary relationship. Counsel, this went out on a summary judgment, right? Correct. Are there any factual questions regarding the nature and extent of this control that would warrant a remand? Not at all. And, in fact, there is one specific fact that is not at all in dispute, despite what you may have taken away from the plaintiff's briefs. There is no dispute at all that the city ordered this demolition. There are a number of insinuations in the plaintiff's brief and outright accusations that Pekin or the Schmitz deliberately destroyed this building, made the decision to destroy the building in some cases, it is said. Even this morning, Mr. Bruce has found himself saying time and again that Pekin bulldozed the home. That isn't the way that it happened. There is no point in contention whatsoever that this demolition took place approximately two months after the fire at the city's order. There is also no point in contention that Mrs. Combs was never notified of the bulldozing before it happened. That is correct. She was not notified that the bulldozing was going to happen. That, again, goes back to whether she was in a relationship with Pekin or the Schmitz as such that they had to notify her of that. When it comes to this relationship, this court has had some cases where we really kind of parse out between relationship, foreseeable, and we criticize the 5th District on either eviscerating the relationship wrong or at least not blending them together. Why isn't foreseeability something that we should consider in seeing whether there is a relationship, as the 5th District did, as counsel has argued that that's one of the factors, one of the martial factors on a duty? Why shouldn't we look at, why shouldn't we put blinders on and say relationship, okay, now we got that, now we go to foreseeability. Why don't we look to see whether, in order to establish a relationship, whether Pekin should reasonably foresee whether some people out there may need this building? Because of the very concern that Your Honor raised this morning during Mr. Bruce's argument, defendants can't be responsible to the whole world to anticipate whoever might be out there unanticipated that might have some reason to want the evidence. Then we go to the reasonableness of the foreseeability. Again, I don't think someone in India would need this building, and I don't think it would be reasonably foreseeable for Pekin to say, oh, someone out there in some other country might need this building. This is a woman who lost three family members in this home, and that's a little different than anybody in the whole world. And the way that the Supreme Court has chosen to resolve that question is to say first relationship and second foreseeability, and not necessarily in that order, but two separate prongs that have to be established. It isn't necessarily a decide one and then get to the other. If foreseeability were the only real issue here, then we could address that first. But the question here is the relationship and whether there was any relationship. There was no exercise of the necessary control in this situation as demonstrated by the demolition order. Note that it's key to the plaintiff's argument, raised for the first time in the reply brief and therefore likely waived, but even if you address the merits, key to their argument that Pekin or the Schmitz could have requested an extension of time from the city. As we learned during discovery, apparently these extensions of time are routinely granted. But what kind of control is that if the defendants had to request that the city authorities put a stay on their demolition order? If the defendants had to request permission to not comply with a lawful order? That order is appended to our brief. You can take a look at it. There's nothing on its face that makes it look negotiable. There's no reason the defendants shouldn't have assumed that the city meant what it said. Is Mr. Carlson going to have a minute or two? I'd like to give him that, Your Honor. I'd be happy to address any further questions the court might have, but I will yield the rest of my time to Mr. Carlson. Good morning. I'm Eric Carlson, and I represent the Schmitz. One point that I would like to bring up with regards to the Schmitz in particular is that they never did investigate this house. There's no evidence that they ever even went back to this house. Any duty that they may have owned is premised upon an allegation, I believe, that comes up in the complaint that Pekin was somehow acting as their agent. That argument was not raised in this appeal. There is no issue of agency. There are no facts to establish agency. These internal memos don't apply to the Schmitz themselves. In any regard, there is nothing that actually comes back to anything for the Schmitz. That being said, Pekin also does not have any duty in this case because with the issue of control and possession, there is no factual dispute on control and possession. Those facts are all out there. The Schmitz owned the house. They had a right to control it. They never possessed it during the period of time between the fire and the demolition of the house. The plaintiff had a leasehold interest in the house. She had a right to control and possess it. However, there's no evidence that she did control or possess it during that approximately two-month period. Pekin, through the consent agreement, had a right to control and possess the house, and they used that right for approximately three hours for their investigation. There is no dispute as to any of those facts. That is what happened with the control and possession. The few things which were actually controlled by Pekin were the wire and the smoke detectors, which are still preserved. There is no issue as to those. There has been no voluntarily assumed duty taken on by anybody, and I believe that one of the things I raised in my complaint is the problem that comes up with the Fifth District cases where they apply the voluntarily assumed duty to any potential litigant, which really turns the whole issue of a voluntarily assumed duty on its head, because in order for there to be a voluntarily assumed duty, it has to be a duty to another person, from, for instance, the defendant to the plaintiff. What about the fact, is it disputed, that the Combs family complained to the Schmitz, the owners, that there were problems with the electrical system? Is that a fact? That is a fact. Did the Schmitz ever agree to make repairs? That actually comes up in the negligence case, not in this case, but there was at least an issue of fact, and that was one of the reasons there was no summary judgment on the negligence case. There was at least an issue of fact as to whether or not the Schmitz promised to send out an electrician. But that has nothing to do with any preservation of evidence. There certainly was no promise made to preserve evidence in this case. The promise, which may have been made, was to send out an electrician before the fire ever occurred, not to preserve evidence into perpetuity. That simply never occurred at all. It's also important to recall that with issues of voluntary undertaking, this is an issue of nonfeasance. They're saying that we didn't do something, we did not preserve. The plaintiffs have tried to paint this as a misfeasance, but that is not actually what's going on here. In order for there to be a nonfeasance issue with voluntary undertaking, there has to be some sort of promise. In this case, there was no promise and no reliance. And do you have any further questions? I believe my time's up. Thank you, Mr. Giles. Thank you. Mr. Burris. Thank you so much, Justice. I want to hit on a couple of points that were just raised. First of all, Justice Hudson, in response to your question of Mr. Howie, why doesn't it apply, I made clear in my briefs, they seem to be putting a duty upon me, I'm citing the Supreme Court's rule of law set forth in Dix and its progeny. That says that Mrs. Combs, in this case, as a tenant, was a co-insured. You asked the question, is there any qualifying language, there isn't any. And I would suggest to you that if that's the rule of law, what I'm citing, it's incumbent upon them to provide some qualifying language. And I think we all know Justice Heiple was very profound and outspoken in his comments. If you look at the dissent in Dix, I think that's illustrative of the point that we're talking about here. Justice Heiple wrote, and I quote, the effect of this ruling is, quote, to make all tenants, anytime, anywhere, co-insureds with landlords. That's page 326. Justice Heiple was only clarifying what the court's ruling was, and that is the rule of law. But that's been limited since then, in the Hacker case, at least, on a liability policy, correct? Well, it hasn't been run over by the Supreme Court, Justice. I understand, that's good. Okay, so, in any event, now, another point that Mr. Howie made, I just want to make sure we're all on the same page. There's no question that the reason why Peking went into and investigated and performed a fire investigation where three people burned alive was because of the insurance policy and, as well, the corresponding consent agreement that's at issue here. They didn't just willy-nilly walk in there. They did it, and that raises the point that you were asking about, you know, what kind of issues came up in the policy about duties and responsibility. That's why they went in there, is because there was a policy in effect. And their own experts repeatedly testified, whether this is a point of fact or not, but they told me that when they perform the fire investigation, when someone in Peking's context does that, they have a duty and responsibility to do so and find out what the cause of the fire is, regardless of who's at fault. And I think that's an important point. You say, well, where did this all come up? And they're saying, well, we didn't have a responsibility. Well, that's not what their expert says, and that's not what Tom Messer told me when I asked him about your authority pursuant to the consent agreement. They have the authority to preserve any of the evidence at that scene, and that's the unrefuted record here. Now, in terms of the possession and control, Justice Burke, you were the one that asked the question of counsel about, you know, all I'm suggesting with possession and control is if you look at the Fifth District cases, we know what happened here. They cannot argue that there was not an inspection. And what I'm suggesting to you is if, in fact, we know that to be true, if you look at Jones v. O'Brien or the Martin v. Keeley case, what those cases say is if you preserved it long enough for you to do your own inspection, you've got to have a duty to keep preserving it. And those cases did look at possession and control. And so I'm saying here we know that there was an inspection. One, they did inspect it for their benefit, and I also say for Mrs. Combs' co-insurer, but then they did have possession and control. And with respect to Brobey, Brobey did. I'm being candid. Brobey did look at whether or not Enterprise was in possession or control under that special circumstances concept, and they found that Enterprise did have possession and control, and we have overwhelming facts here. Now, I do think it's shocking, and I think it's respectfully a misrepresentation of the cases to say that there is a – you have to make a request as a victim in order for that to trigger the duty. Maybe I misheard that, but that is not the state of the law in Illinois, that one has to make a request in order for the duty to be imposed. Now, in terms of this question about whether or not Pekin was aware of the complaints prior, this was an interesting point that came up in the discovery of the case. If you remember in Dardene, they actually got the communication somehow – I don't know how they did it, it wasn't specified in the opinion – between State Farm Insurance and the insured about what was said between them. I asked for a request for protection, and it was denied. I moved for a compel, it was denied. There is, undisputedly, and it's in the record, a statement right after this between the Schmitz and Pekin. Now, I would suggest that's circumstantial evidence that the Schmitz told them that there were complaints about this beforehand. I was barred from having that knowledge, but there's certainly knowledge from numerous tenants beforehand that they made complaints, and what I said afterwards about Pekin having actual knowledge of the complaints that were made. And I think the point here is, look, just think about the logic behind why the courts have relied upon that. Why does the courts look at the fact that the alleged spoliator knew that there were problems alleged about the evidence before the evidence was destroyed? Why is that important? Because it goes to the issue of they should know not to destroy it. And here, Pekin knew that there were complaints about electrical problems, unrefuted, uncontradicted. They knew, Pekin knew, there were electrical problems in this house where three people burned alive. They knew that, and they bulldozed it anyway. Now, this whole issue, I've been blinded throughout this case about what I misquoted. I took the man's deposition, and I finally quoted it in my reply brief so that I don't get impunity. I asked the question, so someone from Pekin, this is their management level employee, Mr. Avery. So someone from Pekin had to make a decision, we're going to hire this firm to demolish this home. Is that correct? Answer correct. That's volume 19, page 4431. That's the quote that I'm relying upon. I asked their management level employee that question, and he gave me that answer. In terms of there is this issue, one of the justices asked about control of the city. Just so we don't leave here today, I asked the city employees that they chose to depose when it was that the city relinquished control of that. And they relinquished control of that property two days following this occurrence. Following the fire, their employees said, we relinquished control of it. So there's no misunderstanding. This whole issue about the demolition order and the city having control, they didn't have control. That's what's in the record. And even if you're going to look at that, that's a question of fact. That's a disputed fact. We're here on summary judgment. And lastly, in terms of the relationship, Justice Enoch, you asked me a lot of questions about the contract in between the various parties to this case. I mean, I would keep in mind and emphasize this is a commercial liability property policy between Pekin and Schmitz. Pekin knew that they were renting this home and knew the tenant would be paying rent in order to pay for that portion of the insurance policy. I mean, so it's not as if they're in the dark. And that's all. And I think my time, unless there's any questions. Thank you so much for your time today. Thank you very much, counsel. The court will take the matter under advisement and render a decision in due course. Court stands in recess.